IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| BOARD OF REGENTS, <br> THE UNIVERSITY OF TEXAS <br> SYSTEM AND TISSUEGEN, INC., <br><br>     PLAINTIFFS, <br><br> v. <br><br> ETHICON, INC. AND <br> ETHICON US, LLC, <br><br>     DEFENDANTS. | § § § § § § § § § § § § § § § <br><br> Case No. 1:17-cv-01084-LY |

## AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1. Pursuant to the Post-*Markman* Scheduling Order (Dkt. 71), Board of Regents, The University of Texas System ("UT") and TissueGen, Inc. ("TissueGen") (collectively, "Plaintiffs") file this Amended Complaint for Patent Infringement against Ethicon, Inc. ("Ethicon") and Ethicon US, LLC ("US LLC") (collectively, "Defendants") as follows:

## The Parties

2. The Board of Regents is the governing body for the University of Texas System, which includes eight universities and six health institutions. The Board's nine regents are appointed by the Governor of Texas and confirmed by the Texas Senate, and the Board's authority to govern the University of Texas System is delegated to it by the Texas Legislature. UT is an arm of the State of Texas and is the assignee and exclusive owner of patents resulting from research conducted at the University of Texas System, including U.S. Patent No. 6,596,296, titled "Drug releasing biodegradable fiber implant" ("'296 patent"). UT's principal place of business is at 201 West 7th Street, Austin, Texas 78701.

3. By filing this lawsuit and Amended Complaint in the United States District Court for the Western District of Texas, UT did not and does not submit to the jurisdiction of any court

1

sitting outside of the State of Texas, and UT did not and does not waive any other attribute of sovereignty enjoyed by the State of Texas and arms thereof, including, for example, immunity to any *inter partes* review, *ex parte* reexamination, or other post-grant proceeding at the United States Patent and Trademark Office and immunity to any noncompulsory counterclaims, or to any other federal or state proceeding whatsoever, whether or not initiated by Defendants.

4.  TissueGen is the exclusive licensee of the '296 patent and develops products with biodegradable polymer fibers for advanced drug delivery, nerve regeneration, and tissue engineering. TissueGen has a principal place of business at 2110 Research Row, Suite 330, Dallas, Texas 75235.

5.  Ethicon, Inc. ("Ethicon"), a wholly owned subsidiary of Johnson & Johnson, makes and sells surgical devices and other products, including certain bioabsorbable antibacterial sutures that Plaintiffs contend practice claims of the '296 patent. Ethicon owns and/or operates facilities in the United States, including in San Angelo, Texas and Cornelia, Georgia, where steps in the production of such products take place. Ethicon is registered to conduct business in Texas with the Texas Secretary of State and has a registered agent, CT Corporation System, Inc., at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

6.  Ethicon US, LLC ("US LLC"), a limited liability company formed under Texas law, markets, sells, and supports the sale and use of Ethicon products, including certain bioabsorbable antibacterial sutures that Plaintiffs contend practice claims of the '296 patent. US LLC publishes websites and other media intended to support the sale of Ethicon products and enable use of the same by healthcare professionals and others in the United States. US LLC is registered to conduct business in Texas with the Texas Secretary of State and has a registered agent, CT Corporation System, Inc., at 1999 Bryan St., Ste 900, Dallas, Texas 75201.

## Jurisdiction and Venue

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.

8. This Court has personal jurisdiction over Defendants because (a) each "admits for purposes of this action only that it does not contest personal jurisdiction in this judicial district"; (b) each waived its right to challenge personal jurisdiction by failing to raise a lack of personal jurisdiction defense in its Answer (Dkt. 16); and because, directly or through intermediaries, (c) each has committed acts within the District giving rise to this action and/or has established minimum contacts with the District such that the exercise of jurisdiction comports with due process.

9. This Court has venue over Defendants because they have waived any objection they had to venue through their litigation conduct. Over the course of almost two years of litigation, Defendants have participated in two in-person scheduling conferences before Judge Yeakel; participated in a 2-day in-person claim construction hearing before Judge Yeakel; participated in a telephonic hearing with Judge Yeakel; served invalidity contentions; conducted claim construction discovery; filed claim construction briefs; entered agreed scheduling and protective orders with Plaintiffs; conducted merits discovery concerning the '296 patent, including several depositions; and moved the Court on several occasions to allow their out-of-state counsel to appear *pro hac vice*. Defendants thereby have waived any objection they had to venue. *United States v. Ziegler Bolt & Parts Co.*, 111 F.3d 878, 882 (Fed. Cir. 1997) ("A defendant may waive such affirmative defenses by actively litigating the suit, even where the defenses are properly included in the defendant's answer."); *Koninklijke Philips N.V. v. ASUSTek Comput. Inc.*, No. 1:15-cv-1125-GMS, 2017 WL 3055517, at *3 (D. Del. July 19, 2017) (Sleet, J.) (finding that defendants' conduct waived any venue defense where they "(1) participated in a scheduling conference;

3

(2) conducted discovery; (3) entered into a stipulation and protective order with the plaintiff; and (4) moved the court to allow their out of state counsel to appear *pro hac vice*.").

## TissueGen's Foundation

10.     In the late 1990s, TissueGen's founder Dr. Kevin D. Nelson, while still faculty in Biomedical Engineering at The University of Texas at Arlington, was inspired to investigate delivering drugs directly from an extruded fiber while working to develop biodegradable vascular stents and microspheres for delivering non-toxic drugs to the inner ear.

11.     Dr. Nelson's early work was followed by collaborations with Dr. George Smith at UT Southwestern Medical Center at Dallas, a leading researcher working on peripheral nerve regeneration, as well as Dr. Nadir Alikacem at the Callier Center, Texas Woman's University.

12.     Working in peripheral nerve regeneration, Dr. Nelson and Dr. Smith showed fascicle formation in regenerated nerves with the aid of fibers, convincing Dr. Nelson that the fiber-based drug delivery technology had commercial viability.

13.     The peripheral nerve regeneration work was the culmination of a long line of extremely successful experiments that demonstrated the benefit of drug delivery fibers in numerous applications.

14.     With Dr. Alikacem, for example, Dr. Nelson demonstrated the ability to load a small pharmaceutical agent into a fiber to help stem the blindness that results from diabetes.

15.     In 2000, Dr. Nelson embarked upon the path to commercialization by founding TissueGen. Dr. Nelson's work led to several issued patents, ultimately assigned to UT and licensed exclusively to TissueGen, including the '296 patent.

16.     Following relentless development efforts spanning more than a decade, TissueGen has brought the scientific promise of implantable drug delivery via biodegradable fibers to commercial reality.

17. In 2013, TissueGen commercially released ELUTE® fiber, a groundbreaking biodegradable fiber format for advanced drug delivery, nerve regeneration, and tissue engineering.

18. ELUTE® fiber may directly replace standard fibers used in biodegradable textiles currently on the market and provide significantly improved clinical outcomes by delivering therapeutic agents directly at the site of the implant.

19. By delivering therapeutic agents including, but not limited to, pharmaceuticals and growth factors at the topical application or implant site, ELUTE® fiber may enable medical devices to aid the body's healing and regenerative processes.

## The '296 patent

20. On July 22, 2003, U.S. Patent No. 6,596,296 B1 (the "'296 patent")—titled "Drug Releasing Biodegradable Fiber Implant"—was duly and legally issued by the United States Patent and Trademark Office to Board of Regents, The University of Texas System, as assignee of named inventors Kevin D. Nelson, Andres A. Romero-Sanchez, George M. Smith, Nadir Alikacem, Delia Radulescu, Paula Waggoner, and Zhibing Hu. A true and correct copy of the '296 patent is attached hereto as Exhibit A.

21. UT is the owner of all right, title, and interest in and to the '296 patent and has granted TissueGen an exclusive license "to manufacture, have manufactured, use, have used, and/or Sell or have Sold" products including inventions and discoveries covered by the '296 patent and "to otherwise exploit" UT's rights in information or discoveries covered by the '296 patent.

22. The '296 patent is directed to useful and novel compositions that provide for three-dimensional matrices for in vitro and in vivo use comprised of biodegradable polymer fibers capable of the controlled delivery of therapeutic agents.

23. Claim 1 of the '296 patent recites "A composition comprising at least one biodegradable polymer fiber wherein said fiber is composed of a first phase and a second phase,

the first and second phases being immiscible, and wherein the second phase comprises one or more therapeutic agents." Claim 2 of the '296 patent recites "The composition of claim 1, wherein said second phase is derived from an aqueous solution, a hydrogel or polymer." Claim 4 of the '296 patent recites "The composition of claim 1, wherein said fiber is woven, braided or knitted in an assembly with other fibers, and at least one fiber in the assembly comprises one or more therapeutic agents." Claim 11 of the '296 patent recites "The composition of claim 1, wherein said one or more therapeutic agents are selected from the group consisting of drugs, proteins, enzymes, growth factors, immunomodulators, compounds promoting angiogenesis, compounds inhibiting angiogenesis, anti-inflammatory compounds, antibiotics, cytokines, anti-coagulation agents, procoagulation agents, chemotactic agents, agents to promote apoptosis, agents to inhibit apoptosis, and mitogenic agents." Claim 16 of the '296 patent recites "The composition of claim 1, wherein said biodegradable polymer is a single polymer, a co-polymer, or a mixture of polymers selected from the group consisting of polypeptides, polydepsipeptides, nylon copolyamides, aliphatic polyesters, polydihydropyrans, polyphosphazenes, poly(ortho ester), poly(cyano acrylates), polyanhydride, modified polysaccharides and modified proteins." Claim 17 of the '296 patent recites "The composition of claim 16, wherein said aliphatic polyesters are selected from the group consisting of poly(glycolic acid), poly(lactic acid), poly(alkylene succinates) poly(hydroxybutyrate), poly(butylene diglycolate), poly(epsilon-caprolactone) and copolymers, blends and mixtures thereof." Claim 20 of the '296 patent recites "The composition of claim 1, wherein said fiber comprises a plurality of polymer layers, wherein an outer layer circumscribes an adjacent inner layer." Claim 26 of the '296 patent recites "The composition of claim 1, wherein said one or more therapeutic agents are released at varying rates over time from said fiber."

24.     Each and every claim of the '296 patent is valid and enforceable and enjoys a

statutory presumption of validity separate, apart, and in addition to the statutory presumption of validity enjoyed by every other of its claims. 35 U.S.C. § 282. Each of claims 1, 2, 4, 6, 7, 8, 11, 16, 17, 20, and 26 of the '296 patent is valid and enforceable and enjoys a statutory presumption of validity separate, apart, and in addition to the statutory presumption of validity enjoyed by every other of its claims. 35 U.S.C. § 282.

## The Accused Products

25. The Coated VICRYL® Plus Antibacterial (Polyglactin 910) Suture is a multifilament (braided) synthetic absorbable surgical suture and is composed of a copolymer made from 90% glycolide and 10% L-lactide. It is coated with a mixture composed of equal parts of Polyglactin 370 (65%PLA/35%PGA, a copolymer of glycolide and L-lactide) and calcium stearate. A small amount of an antibacterial agent, triclosan, has been added to the suture coating. The FDA Premarket Notification Numbers corresponding to the Coated VICRYL® Plus Antibacterial (Polyglactin 910) Suture include K032420, K132580, and K181652. Hereafter, the term "Coated VICRYL Plus Suture" refers to the Coated VICRYL® Plus Antibacterial (Polyglactin 910) Suture; all models thereof corresponding to any of FDA Premarket Notification Numbers K032420, K132580, and K181652; all models thereof identified in Endnote i of Exhibit B, attached to this Amended Complaint; "Coated VICRYL® Plus" products identified by Ethicon in response to Plaintiffs' Interrogatory No. 3; and all braided strands of material composed of a copolymer made from 90% glycolide and 10% L-lactide and coated with a mixture composed of equal parts of Polyglactin 370 (65%PLA/35%PGA, a copolymer of glycolide and L-lactide) and calcium stearate, regardless of whether needles have been attached to such strands.

26. The MONOCRYL® Plus Antibacterial (Poliglecaprone 25) Suture is a monofilament synthetic absorbable surgical suture prepared from a copolymer of glycolide and epsilon-caprolactone. The suture contains an antibacterial agent, triclosan, and is based on

7

segmented block copolymers of epsilon-caprolactone and glycolide. The FDA Premarket Notification Numbers corresponding to the MONOCRYL® Plus Antibacterial (Poliglecaprone 25) Suture include K050845. Hereafter, the term "MONOCRYL Plus Antibacterial Suture" refers to the MONOCRYL® Plus Antibacterial (Poliglecaprone 25) Suture; all models thereof corresponding to any of FDA Premarket Notification Number K050845; all models thereof identified in Endnote ii of Exhibit B, attached to this Amended Complaint; and all "MONOCRYL® Plus" products identified by Ethicon in response to Plaintiffs' Interrogatory No. 3.

27. The STRATAFIX™ Spiral MONOCRYL™ Plus Knotless Tissue Control Device is an antibacterial monofilament, synthetic absorbable device prepared from a copolymer of glycolide and ε-caprolactone. The device contains an antibacterial agent, triclosan, and is based on segmented block copolymers of epsilon-caprolactone and glycolide. The FDA Premarket Notification Numbers corresponding to the STRATAFIX™ Spiral MONOCRYL™ Plus Knotless Tissue Control Device include K151200 and K182873. Hereafter, the term "STRATAFIX Spiral MONOCRYL Plus Knotless Tissue Control Device" refers to the STRATAFIX™ Spiral MONOCRYL™ Plus Knotless Tissue Control Device; all models thereof corresponding to any of FDA Premarket Notification Numbers K151200 and K182873; all models thereof identified in Endnote iii of Exhibit B, attached to this Amended Complaint; and all "STRATAFIX™ Spiral MONOCRYL™ Plus" products identified by Ethicon in response to Plaintiffs' Interrogatory No. 3.

28. Hereafter, the term "Accused Products" refers to the Coated VICRYL Plus Suture, MONOCRYL Plus Antibacterial Suture, and the STRATAFIX Spiral MONOCRYL Plus Knotless Tissue Control Device.

## Count I (Infringement of U.S. Patent No. 6,596,296)

29. Plaintiffs repeat and re-allege each and every allegation of the prior paragraphs as though set forth fully herein.

30. As set forth in row (1) of Exhibit B attached hereto, the Coated VICRYL Plus Suture practices claims 1, 4, 11, 16, 17, 20, 26 of the '296 patent. The Coated VICRYL Plus Suture practices claim 1 of the '296 patent because each includes a strand of braided bioabsorbable polymer filaments coated with a bioabsorbable polymer layer composed of discrete triclosan-containing regions of calcium stearate (second phase) dispersed throughout (not dissolved in) a polymer portion made up of a copolymer of glycolide and lactide (first phase). The Coated VICRYL Plus Suture practices claim 4 of the '296 patent because each said coated bioabsorbable polymer filament is braided in assembly with other filaments. The Coated VICRYL Plus Suture practices claim 11 of the '296 patent because triclosan is part of the general class of antibiotics. The Coated VICRYL Plus Suture practices claims 16 and 17 of the '296 patent because a copolymer of glycolide and lactide is part of the class of aliphatic polyesters. The Coated VICRYL Plus Suture practices claim 20 of the '296 patent because the bioabsorbable coating layer of the strand circumscribes the inner braided bioabsorbable polymer filaments. The Coated VICRYL Plus Suture practices claim 26 of the '296 patent because the rate at which triclosan is released is not constant, but instead varies with time. Plaintiffs repeat and re-allege each and every allegation set forth in row (1) of Exhibit B attached hereto as though set forth fully herein.

31. As set forth in row (2) of Exhibit B attached hereto, the MONOCRYL Plus Antibacterial Suture practices claims 1, 2, 11, 16, 17, 26 of the '296 patent. The MONOCRYL Plus Antibacterial Suture practices claim 1 of the '296 patent because each includes at least one bioabsorbable polymer filament composed of discrete triclosan-containing regions of polyglycolic acid (second phase) dispersed throughout (not dissolved in) a random copolymer portion made up

9

of epsilon caprolactone and polyglycolic acid (first phase).  The MONOCRYL Plus Antibacterial Suture practices claim 2 of the '296 patent because the second phase is derived from a polymer, namely polyglycolic acid.  The MONOCRYL Plus Antibacterial Suture practices claim 11 of the '296 patent because triclosan is part of the general class of antibiotics.  The MONOCRYL Plus Antibacterial Suture practices claims 16 and 17 of the '296 patent because the random copolymer portion made up of epsilon caprolactone and polyglycolic acid (first phase) would be characterized as within the class of aliphatic polyesters.  The MONOCRYL Plus Antibacterial Suture practices claim 26 of the '296 patent because the rate at which triclosan is released is not constant, but instead varies with time. Plaintiffs repeat and re-allege each and every allegation set forth in row (2) of Exhibit B attached hereto as though set forth fully herein.

32.     As set forth in row (3) of Exhibit B attached hereto, the STRATAFIX Spiral MONOCRYL Plus Knotless Tissue Control Device practices claims 1, 2, 11, 16, 17, 26 of the '296 patent. The STRATAFIX Spiral MONOCRYL Plus Knotless Tissue Control Device practices claim 1 of the '296 patent because each includes at least one bioabsorbable polymer filament composed of discrete triclosan-containing regions of polyglycolic acid (second phase) dispersed throughout (not dissolved in) a random copolymer portion made up of epsilon caprolactone and polyglycolic acid (first phase).  The STRATAFIX Spiral MONOCRYL Plus Knotless Tissue Control Device practices claim 2 of the '296 patent because the second phase is derived from a polymer, namely polyglycolic acid.  The STRATAFIX Spiral MONOCRYL Plus Knotless Tissue Control Device practices claim 11 of the '296 patent because triclosan is part of the general class of antibiotics.  The STRATAFIX Spiral MONOCRYL Plus Knotless Tissue Control Device practices claims 16 and 17 of the '296 patent because the random copolymer portion made up of epsilon caprolactone and polyglycolic acid (first phase) would be characterized

as within the class of aliphatic polyesters. The STRATAFIX Spiral MONOCRYL Plus Knotless Tissue Control Device practices claim 26 of the '296 patent because the rate at which triclosan is released is not constant, but instead varies with time. Plaintiffs repeat and re-allege each and every allegation set forth in row (3) of Exhibit B attached hereto as though set forth fully herein.

33. Plaintiffs adopt, and incorporate by reference, as if fully stated herein, the claim chart attached hereto as Exhibit B. The claim chart describes and demonstrates how the Accused Products practice claims 1, 2, 4, 11, 16, 17, 20, and 26 of the '296 patent.

34. Defendants have directly infringed and continue to directly infringe claims 1, 2, 4, 11, 16, 17, 20, and 26 of the '296 patent under 35 U.S.C. § 271(a) by making the Accused Products (and any other products that practice any of claims 1, 2, 4, 11, 16, 17, 20, and 26) in the United States and by selling, offering to sell, and importing them in and/or into the United States. By way of example, Ethicon has made and continues to make the Accused Products in the United States, including through its manufacturing facilities in Cornelia, Georgia and San Angelo, Texas. Ethicon also has sold, offered to sell, and imported, and continues to sell, offer to sell, and import, the Accused Products in and into the United States, including to distributors, hospitals, and other counterparties. Likewise, US LLC has sold and offered to sell, and continues to sell and offer to sell, the Accused Products in and into the United States, including to physicians, hospitals, and other third parties.

35. Defendants likewise have indirectly infringed and continue to indirectly infringe claims 1, 2, 4, 11, 16, 17, 20, and 26 of the '296 patent in violation of 35 U.S.C. § 271(b). Defendants have known of the '296 patent since at least November 15, 2017 when the complaint in this action was filed. Defendants have known of the '296 patent since in or about 2011 when Ethicon and/or US LLC acquired from Angiotech rights in certain intellectual property assets

owned by Angiotech and TissueGen. Those intellectual property assets included patent applications directed to drug-eluting fiber-based sutures, and such patent applications explicitly and repeatedly identified and incorporated by reference the '296 patent. Since acquiring those intellectual property assets, Ethicon and/or US LLC have prosecuted such patent applications and their prosecution activities have continued even after the complaint in this action was filed. With knowledge of the '296 patent, Ethicon and US LLC have actively encouraged third parties to sell and use the Accused Products knowing the same would infringe the '296 patent and with the specific intent to induce that infringement. By way of example, Ethicon and/or US LLC have entered and continue to enter into contractual relationships with distributors, hospitals, and other counterparties thereby intentionally controlling and/or directing the distribution, sale, and use of the Accused Products by such counterparties. Further, Ethicon and/or US LLC have created, published, and disseminated websites and other information (e.g., product specifications, instructions for use, product demonstrations, brochures, marketing campaigns, promotional materials, educational presentations, papers and speeches) designed and intended to support and enable the sale of the Accused Products, e.g., by distributors, and the use of such products, e.g., by physicians, hospitals, and other healthcare entities, in the United States. Defendants continue to engage in such activities both by direct engagement in industry conferences and through publication of materials "intended for U.S. audiences only" through websites, including https://www.jnjmedicaldevices.com/en-US/product/coated-vicryl-plus-antibacterial-polyglactin-910-suture, https://www.jnjmedicaldevices.com/en-US/product/monocryl-plus-antibacterial-poliglecaprone-25-suture, and https://www.jnjmedicaldevices.com/en-US/product/stratafix-spiral-knotless-tissue-control-device.

      36.     Defendants' infringement of the '296 patent has been and continues to be willful.

Defendants have known of the '296 patent since at least November 15, 2017 when the complaint in this action was filed. Defendants have known of the '296 patent since in or about 2011 when Ethicon and/or US LLC acquired from Angiotech rights in certain intellectual property assets owned by Angiotech and TissueGen. Those intellectual property assets included patent applications directed to drug-eluting fiber-based sutures, and such patent applications explicitly and repeatedly identified and incorporated by reference the '296 patent. Since acquiring those intellectual property assets, Ethicon and/or US LLC have prosecuted such patent applications and their prosecution activities have continued even after the complaint in this action was filed. Nevertheless, without authorization, Defendants have continued to infringe claims 1, 2, 4, 11, 16, 17, 20, and 26 of the '296 patent as set forth in ¶¶ 29-35 above.

37. Defendants' acts of infringement have caused and will continue to cause damage to Plaintiffs, and Plaintiffs are entitled to recover from Defendants the damages they sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

38. As a result of Defendants' infringement of the '296 patent, Plaintiffs have been damaged. Plaintiffs are, therefore, entitled to damages pursuant to 35 U.S.C. § 284 in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs pray for entry of judgment against Defendants as follows:

A. Declaring that Defendants have infringed the '296 patent and induced infringement of the '296 patent;

B. Finding that Defendants' infringement of the '296 patent was willful;

C.  Awarding to Plaintiffs damages arising out of Defendants' infringement of the '296 patent, including enhanced damages pursuant to 35 U.S.C. § 284, together with prejudgment interest, in an amount according to proof;

D.  Awarding attorneys' fees to Plaintiffs pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

E.  Awarding such other costs and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues triable to a jury.

Dated: September 20, 2019

Respectfully submitted,

*/s/ Alfonso G. Chan*
Michael W. Shore (Texas 18294915)
mshore@shorechan.com
Alfonso G. Chan (Texas 24012408)
achan@shorechan.com
Christopher Evans (Texas 24058901)
cevans@shorechan.com
Samuel E. Joyner (Texas 24036865)
sjoyner@shorechan.com
Chijioke E. Offor (Texas 24065840)
coffor@shorechan.com
SHORE CHAN DEPUMPO LLP
901 Main Street, Suite 3300
Dallas, Texas 75202
TELEPHONE: (214) 593-9110
FACSIMILE: (214) 593-9111

**COUNSEL FOR PLAINTIFFS BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC.**